Filed 8/14/25  P. v. Espinosa CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063284 |
| v. | (Super. Ct. No. RIF1903406) |
| CARY GLEN ESPINOSA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Jeffrey M. Zimel, Judge. Affirmed.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Alan L. Amann and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

Cary Glen Espinosa appeals after a jury convicted him of sexually abusing three minors and the trial court sentenced him to prison for 50 years to life consecutive to a three-year term. He contends the court committed prejudicial error by admitting expert testimony concerning child sexual abuse accommodation syndrome (CSAAS) and by instructing the jury on the use of such evidence with CALCRIM No. 1193. We conclude the court did not abuse its discretion by allowing the expert testimony and did not err with its instruction on the consideration of this evidence. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

CHARGES

The district attorney charged Espinosa with commission of a lewd act upon J.M., a child under the age of 14 (Pen. Code, § 288, subd. (a); count 1);[1] oral copulation or sexual penetration of M.M., a child 10 years old or younger (§ 288.7, subd. (b); count 2); commission of a lewd act upon M.M., a child under the age of 14 years (§ 288, subd. (a); count 3); attempted sexual intercourse of L.M., a minor 14 years old or older, by force or fear (§§ 664, 264, subd. (c)(2); count 4); and sexual battery of L.M., a misdemeanor (§ 243.4, subd. (e)(1); count 5). The information alleged Espinosa committed a qualifying sex offense against more than one victim. (§ 667.61, subd. (e)(4).)

---

[1] Undesignated statutory references are to the Penal Code.

## II.

### TRIAL

*A. Non-expert Testimony*

1. J.M. and M.M.

J.M. and her older sister M.M. frequently stayed with their paternal grandmother in Espinosa's house between 2004 and 2006. J.M. was between the ages of six and eight years old and M.M. was between the ages of eight and ten years old. The girls slept in their grandmother's bedroom, and Espinosa slept in a separate bedroom.

During their stays, Espinosa sexually abused the girls. On multiple occasions, Espinosa undressed the girls in his bedroom and touched their chests and vaginal areas. He perpetrated additional sex acts against both girls, the details of which are not necessary for our analysis of the issues raised on appeal. Instead, we focus on the facts concerning the girls' reports of abuse and retractions. After J.M. saw Espinosa engaging in a sex act with M.M., J.M. tried to tell her grandmother something was going on, but her grandmother told her it was just in her head.

Both girls also suffered sexual and physical abuse perpetrated against them by their father. M.M. was around 10 or 11 years old when the abuse started, and J.M. was about 13 years old. When J.M. told her grandmother about the abuse by her father, her grandmother said it was normal and instructed J.M. not to tell anyone about it. M.M. also told their grandmother about the abuse by their father, but her grandmother did not believe her.

M.M. eventually reported the abuse by her father to authorities in 2011. She was interviewed multiple times by child protective services and law enforcement concerning the abuse by her father. Her father and

3

grandmother told her to lie about the abuse, and her father would beat her if she did not. During these interviews, M.M. never reported the sexual abuse by Espinosa.

After M.M. reported the abuse by their father, J.M. was interviewed by child protective services multiple times, but she denied anyone had inappropriately touched her. She did not tell them about the abuse by Espinosa or her father. J.M. told child protective services several times her sister M.M. was lying. At trial, now an adult, she explained she lied to child protective services out of fear. When she did not lie about the abuse, her father beat her with a belt.

In 2019, J.M. was interviewed by a detective regarding sexual abuse perpetrated against her by Espinosa. She only disclosed some of the abuse because it was hard for her to discuss all of it. In that interview, she denied Espinosa committed a certain sexual act during an incident, but at trial, she testified he did. Both J.M. and M.M. testified at trial in 2023 they had tried to "block out" and forget a lot of the sexual abuse by Espinosa.

2. L.M.

Espinosa's sexual abuse of J.M. and M.M. occurred less often after their younger cousin L.M. moved into the house in 2007 to live with their grandmother and Espinosa. L.M. was about eight years old at the time. A couple of months after she moved in, L.M. told J.M. Espinosa was sexually abusing her. Again, we do not detail all the abuse Espinosa perpetrated against L.M. as it is unnecessary for our analysis of the appellate issues.

In December 2010, when L.M. was nearly 12 years old, Espinosa attempted to rape her. L.M. told her grandmother about the incident and several days later told her bus driver about it. When the police were called, she also told an officer what happened. Her grandmother took her for a

4

forensic interview and a medical evaluation. Before both, her grandmother told her to lie and tell them nothing happened, threatening to kick L.M. out of the house if she told the truth.

In 2011, when authorities were investigating the sexual abuse allegations concerning M.M. and J.M., the police and social workers talked to L.M.; she told them no one had sexually abused her. Three years later, she was again interviewed by social workers and maintained she had not been sexually abused.

In 2018, J.M. moved in with her grandmother and Espinosa for several months. J.M. witnessed her grandmother physically abuse L.M. every day and saw Espinosa grope L.M.'s breasts and put his hand down L.M.'s pants.

L.M. ran away in 2018 because of the abuse by Espinosa and arguments with her grandmother. L.M. told some family members about the sexual abuse by Espinosa and wrote a letter to the police describing some of it. She eventually moved back in with her grandmother and Espinosa because she had no other place to stay.

After Espinosa and her grandmother were arrested in 2019, L.M. was upset and told the detective nothing had happened. She did this because she was worried if she told the truth something bad would happen to her.

*B. Expert Testimony*

Jody Ward, a clinical and forensic psychologist, testified for the prosecution as an expert on CSAAS. She explained CSAAS is a pattern of behaviors exhibited by many children who have been sexually abused by someone with whom they have an ongoing relationship. Ward testified that about 90 percent of child sexual abuse is perpetrated by someone with whom a child has an ongoing relationship. These children respond differently than

5

children abused by a stranger. Children abused within an ongoing relationship tend not to "report the abuse right away out of love and loyalty toward the abuser." CSAAS seeks to explain why children do not report sexual abuse right away and why they may recant after reporting; it addresses how children react differently than people might expect.

Ward testified the five components of CSAAS are: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed unconvincing disclosure, and (5) retraction and recantation. Not all sexually abused children will exhibit all of these behaviors.

The secrecy component reflects sexual abuse occurs in secret and children keep sexual abuse secret for a long time. Ward testified "most people never disclose sexual abuse or any kind of sexual trauma." Helplessness refers to the power imbalance between the abusive adult and abused child as children are dependent and reliant on adults for their emotional and basic physical needs, including food, clothing, and shelter.

Because of the secrecy and the child's helplessness, the perpetrator is able to continue the sexual abuse and this may result in entrapment and accommodation. The child becomes entrapped in the abusive situation and has to learn to accommodate it. As a way to accommodate and cope with the ongoing abuse, children may try to actively suppress their memories of it. This interferes with their ability to recall memories later. Ward explained it is common for children to love and care about their perpetrators.

Ward described delayed unconvincing disclosure as "the most widely researched aspect of [CSAAS]." She explained research shows two-thirds of people who report sexual abuse wait until adulthood to report it and many never report it at all. Those who do report it tend not to report every

6

detail the first time they make a disclosure. They may test the listener's response before providing more details. If the person to whom they are reporting the abuse is open to hearing the disclosure, the child will share more details of the sexual abuse over time as the child becomes comfortable. But if the person hearing the initial disclosure is not receptive, the child is less likely in the future to share the details of the sexual abuse. The longer the abuse continues, the less likely the child is to disclose it.

The final component Ward discussed was recantation and retraction. She explained "a child may backpedal on the allegations" after the child begins to experience the consequences of the disclosure. In a minority of cases, the child may "recant all allegations of sexual abuse altogether." Ward testified the research shows children take back the abuse allegations "about 22 [or] 23 percent of the time . . . when the abuse is happening within the immediate family." She explained this retraction occurs because the child wants to keep the family together. Once the consequences start occurring after a disclosure, a child may go back to secrecy as a way of coping. Ward stated in "the substantial majority of cases," children recant and take back the disclosure of abuse.

Ward testified she knew nothing about the facts of the case. She explained CSAAS cannot be used to determine whether a sexual assault has occurred or to diagnose someone. In testifying about CSAAS, she was not talking about the alleged victims or the facts of this case but about children generally. She could not say whether the victims in the case were actually abused or whether CSAAS applies to them.

## III.

### VERDICTS AND SENTENCING

The jury convicted Espinosa of all counts and found true the multiple victim allegation. Prior to sentencing, count 2 was dismissed pursuant to section 1385 upon the prosecution's motion.

The trial court imposed a three-year term on Espinosa's conviction for attempted sexual intercourse of L.M. by force or fear (count 4) and ordered Espinosa to serve two consecutive indeterminate terms of 25 years to life for the lewd act convictions (counts 1 & 3). The court also imposed a concurrent term of 180 days in county jail on the misdemeanor sexual battery conviction (count 5). Espinosa timely appealed.

### DISCUSSION

### I.

### ADMISSION OF CSAAS TESTIMONY

Espinosa contends the CSAAS evidence should have been excluded as irrelevant and its admission violated his federal constitutional rights. We disagree.

*A. Additional Background*

Prior to trial, Espinosa moved to exclude the testimony of the prosecution's expert on CSAAS. The prosecutor, arguing for the admission of such evidence, asserted it was "needed to disabuse jurors of the commonly held misconceptions about child sexual abuse and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior, including delayed disclosure, inconsistent statements and recantation." Espinosa argued testimony concerning CSAAS was more prejudicial than probative and should be excluded under Evidence Code section 352. He asserted if expert testimony on CSAAS was to be admitted, it should "be

8

limited to general descriptors regarding CSAAS, . . . the witness be ordered to refrain from giving an opinion on the ultimate issue in this case," and the court instruct the jury with CALCRIM Nos. 1193, 303, and 332 in connection with this testimony.

The trial court ruled the evidence was admissible because the victims' credibility would be challenged by the defense. The court explained the expert would be permitted to testify about CSAAS "to help the jurors decide whether or not the victim[s'] conduct was inconsistent with someone who had been molested, which, I guess, is what the defense is going to be arguing. So the prosecution is entitled to present evidence that the conduct was not inconsistent with someone who has been molested."

*B. Governing Legal Principles*

Expert testimony, like all evidence, must be relevant. (Evid. Code, § 350; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1303.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) "'[T]he trial court is vested with wide discretion in determining relevance' under the Evidence Code" (*McAlpin*, at p. 1303), and its decision "to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown'" (*id.* at p. 1299).

"Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' [Citations.] CSAAS testimony is permitted "'to explain the emotional antecedents of abused

9

children's seemingly self-impeaching behavior,'" such as delayed disclosure of the abuse. [Citations.] An expert's explanation of CSAAS 'is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.'" (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*); accord, *People v. Flores* (2024) 101 Cal.App.5th 438, 458 ["the defense placed the victims' credibility at issue using precisely the kind of 'paradoxical' behaviors, including delayed reporting, helplessness, and memory repression, that CSAAS testimony is admissible to address"]; *Lapenias, supra*, 67 Cal.App.5th at p. 171 ["CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse"]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 ["CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"]; cf. *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64–65 [CSAAS evidence not relevant under the circumstances of the case].)

However, "a CSAAS expert . . . 'may not give "'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.'" [Citation.] Overall, the testimony must respect the "'"fine but essential"'" line between an "'"opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning [the] defendant's legal guilt."'" (*Sedano, supra*, 88 Cal.App.5th at p. 480.)

*C. Analysis*

Espinosa acknowledges CSAAS testimony has generally been permitted "for the limited purpose of rebutting certain myths or

10

misconceptions that jurors may have about how children react to sexual abuse while prohibiting its admission to prove the abuse occurred." Nonetheless, he asserts the trial court erred by admitting the CSAAS evidence here. We disagree.

Ward's expert testimony concerning CSAAS was relevant and admissible as it provided the jury information it could use in evaluating the credibility of all three complaining witnesses, which the defense attacked. J.M. did not tell authorities about Espinosa's abuse until she was an adult, despite being questioned by social workers and law enforcement when she was a minor as to whether anyone had touched her inappropriately. When she did finally disclose the abuse, she did not tell the detective everything. At trial, she testified Espinosa committed a certain sex act against her, but in previously talking to the detective, J.M. denied Espinosa committed that act. J.M.'s delayed reporting and partial disclosure could have raised questions in the jurors' minds as to the veracity of her sexual abuse claims.

Similarly, the jurors could have questioned M.M.'s credibility. While M.M. reported to authorities the sexual abuse by her father when she was a child, she did not report the abuse perpetrated upon her by Espinosa. L.M. also exhibited seemingly paradoxical behavior: as a child, she reported Espinosa attempted to rape her but she then recanted the allegation; despite suffering sexual abuse by Espinosa for years, she did not disclose it to authorities even though she had the opportunity to do so when questioned by social workers as a child; and after she reported the abuse as an adult and Espinosa was arrested, she was angry and denied anything had happened. Ward's testimony concerning CSAAS was relevant as it dispelled misconceptions the jurors might have held that a child subjected to sexual abuse by someone with whom they have an ongoing relationship will

11

immediately report the abuse, disclose all the details of the abuse, and not recant or retract the abuse allegation after the authorities have been contacted.

Espinosa challenges portions of Ward's testimony in which she provided percentages concerning certain behaviors. He cites her testimony that "90 percent of the time" children are abused by someone with whom they have an ongoing relationship and "many times" they are not believed when they report the abuse. He also refers to Ward's testimony that "most people never disclose sexual abuse" and "two-thirds who do report sexual abuse wait until adulthood to report that abuse." Lastly, he references Ward's testimony that "the most common coping mechanism" is for "children [to] try to forget or actively suppress" memories of ongoing abuse. Espinosa contends this testimony in combination with Ward's explanation of CSAAS was improper because it "used probability to predict behavior and used statistical testimony that ignored the relevant population," which was children who alleged sexual abuse.

Espinosa acknowledges he did not object to Ward's "statistical and likelihood testimony generally." The Attorney General argues Espinosa forfeited this portion of his claim by failing to object below. We agree. It is well-established "'the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'" (*People v. Partida* (2005) 37 Cal.4th 428, 433–434; accord, Evid. Code, 353, subd. (a).) Nevertheless, we address Espinosa's claim as he has alternatively argued his counsel rendered ineffective assistance by failing to object.

We conclude this testimony by Ward was properly admitted. This evidence was not the "the sort of statistics that ""convey[] a conclusion

12

concerning defendant's legal guilt.'"'" (*Sedano, supra*, 88 Cal.App.5th at p. 481.) Unlike *People v. Julian* (2019) 34 Cal.App.5th 878, upon which Espinosa relies, here, Ward did not testify about how frequently people make false allegations of childhood sexual abuse. Instead, Ward's testimony touched on how often children have an existing relationship with their abuser, whether they are believed when they make an initial disclosure, how often children delay reporting sexual abuse, and how children cope with ongoing abuse. Ward's statistics and generalities were relevant to help the jury assess the credibility of J.M., M.M., and L.M. "These are not statistics that improperly bear on the specific complainant's veracity, as false allegation statistics necessarily do. They are not statistics that 'plac[e] a thumb on the scale *for guilt*.' [Citation.] Rather, by attempting to dispel two common myths and misconceptions—that abusers are usually strangers to the victim and that victims usually come forward right away—they help the jury objectively 'evaluat[e] the credibility of an alleged child victim of sexual abuse.' [Citations.] This is precisely what CSAAS testimony is meant to do." (*Sedano*, at p. 481.) "Statistical probabilities are not inherently suspect when it comes to explaining CSAAS. Though appropriately broached with caution . . . , CSAAS statistics remain admissible if they merely educate the jury to counter 'a specific "myth" or "misconception" suggested by the evidence.'" (*Id.* at p. 482, fn. omitted.) Here, Ward's testimony did just that. Thus, the trial court did not abuse its discretion in admitting Ward's CSAAS testimony.

Having determined the trial court made a reasoned judgment Ward's expert testimony concerning CSAAS was relevant and admissible, we conclude admission of this evidence did not violate Espinosa's constitutional right to a fair trial. (See *People v. Patino, supra*, 26 Cal.App.4th at p. 1747

13

["introduction of CSAAS testimony does not by itself deny appellant due process"]; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [admission of relevant evidence of battered child syndrome did not violate the defendant's due process rights].)

## II.

## CALCRIM No. 1193

Espinosa contends the trial court committed prejudicial error by instructing the jury with CALCRIM No. 1193 and the instruction violated his federal constitutional rights by reducing the prosecution's burden of proof. We disagree.

Here, as given by the trial court, CALCRIM No. 1193 stated: "You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. [¶] Dr. Jody Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not the complaining witnesses' conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Espinosa argues the instruction was deficient in two ways. First, he contends CALCRIM No. 1193 impermissibly told the jurors they could consider the CSAAS evidence to determine whether the complaining witnesses were believable and therefore whether he was guilty. Second, he

14

asserts it improperly allowed the jurors to use the CSAAS evidence to find the victims' behaviors were consistent with having been abused.[2]

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 326; accord, *Lapenias, supra*, 67 Cal.App.5th at p. 175.)

Addressing a claim concerning CALCRIM No. 1193, a panel of this court previously recognized "[c]ourts have held the pattern jury instruction accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof." (*Lapenias, supra*, 67 Cal.App.5th at p. 175.) As *People v. Gonzales* (2017) 16 Cal.App.5th 494 explained: "A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use Ward's testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes Ward's

---

[2] We note Espinosa requested the trial court instruct the jury with CALCRIM No. 1193 and did not specifically object to the instruction's language. The Attorney General urges us to reject Espinosa's instructional error claim based on invited error and forfeiture. We reach the merits of Espinosa's claim because he contends the instruction affected his substantial rights. (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 604.)

15

testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Id.* at p. 504.) In *Lapenias*, the panel of this court agreed with *Gonzales* and concluded "the official jury instruction accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence." (*Lapenias*, at pp. 175–176.)

Indeed, the language of CALCRIM No. 1193 has been upheld by multiple California Courts of Appeal as properly informing the jury of the use and limitations of CSAAS evidence. (See *People v. Ortiz* (2023) 96 Cal.App.5th 768, 816; *People v. Gonzales, supra*, 16 Cal.App.5th at pp. 503–504; *Lapenias, supra*, 67 Cal.App.5th at pp. 175–176; *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474.) While Espinosa asserts some of these cases were wrongly decided, we are not persuaded. We reach the same conclusion that CALCRIM No. 1193, as given here, properly instructed the jury on the use and limitations of use of CSAAS evidence.

Assessing the instruction in light of the entire record, we are not convinced there is a reasonable likelihood the jurors applied the instruction in an impermissible manner. Thus, the trial court properly instructed the jury with CALCRIM No. 1193 and Espinosa's constitutional rights were not violated by the instruction.

DISPOSITION

The judgment is affirmed.


                              MOTOIKE, ACTING P.J.

WE CONCUR:


MOORE, J.


DELANEY, J.


17